IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 24, 2020

**STATE OF TENNESSEE v. TRENDELL BRADY**

**Appeal from the Criminal Court for Knox County**
**No. 106353, 108642          Steven Wayne Sword, Judge**

————————————————————

**No. E2019-00947-CCA-R3-CD**

————————————————————

The Knox County Grand Jury indicted Defendant, Trendell Brady, on four counts rape of a child. Following a trial, the jury acquitted Defendant of counts one and two and convicted Defendant as charged in counts three and four. The trial court sentenced Defendant as a Range I standard offender to forty years on each count and ran the sentences consecutively. Defendant filed a motion for a new trial, and, after a hearing, the trial court amended the judgments of conviction to reflect twenty-five-year sentences on each count, running consecutively. On appeal, Defendant argues that the evidence was insufficient to support the verdict and that the trial court improperly sentenced Defendant to consecutive twenty-five-year sentences. After a thorough review of the record and applicable case law, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court
Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Gerald L. Gulley, Knoxville, Tennessee, for the appellant, Trendell Brady.

Herbert H. Slatery III, Attorney General and Reporter; Cody N. Brandon, Assistant Attorney General; Charme Allen, District Attorney General; and Nate Ogle, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural History**

*Trial*

The victim[1] testified that she was nineteen years old at the time of trial, that she was born in 1998, and that her mother began dating Defendant around 2004 when they lived in New Orleans, Louisiana. She said that, after Hurricane Katrina in 2005, her mother and Defendant moved her and her six siblings to Clearfield in Knoxville, Tennessee, to live near family. The victim stated that there were times Defendant supervised her and her siblings while her mother worked. She said, "When my mom wasn't home, he treated me like I was his girlfriend. . . . He used to touch me." The victim said that she would ask her brothers to sleep in her room at night so that Defendant "would not come bother [her]." She testified that she was in second and third grades when Defendant would touch her while she was alone in her bedroom. The victim stated that Defendant would "pull down [her] pants and insert his finger into [her] vagina" and that Defendant "didn't want [her] to tell." The victim did not recall Defendant ever threatening her but stated that she was afraid he would hurt her if she told anyone. The victim did not tell her mother because she did not think that her mother would believe her.

The victim testified that, when she was in the fourth grade, she moved to Spruce Street. She said that Defendant "[k]ept touching [her]." The victim testified that, when she was in the sixth grade, Defendant continued touching her. One day in 2009, when the victim and her family lived on Merchants Drive, she saw Defendant lying on the couch with a cross on his chest. She said he "looked dead[.]" The victim said that her mother called an ambulance and that Defendant recovered.

When the victim was in the seventh grade, her family moved again to Jefferson Avenue. She said that she spent a lot of time at her grandmother's house and that Defendant would pick her up. the victim testified that, in July 2010, near her siblings' birthday party, Defendant picked her up from her grandmother's house and took her home and "had sex" with her in her bed. She said that it was the "worst time of [her] life." She said that Defendant removed his "bottoms" and her "bottoms" and "stuck his penis in [her] vagina." The victim stated that Defendant "had sex" with her more than once and that he did not wear a condom.

---

[1] It is the policy of this court to protect the identity of victims of sexual offense, relatives of the victims, and minors.

The victim said that she did not tell anyone because she felt like it was her fault. The victim found out she was pregnant and delivered a son in March of 2011. The victim did not remember if Defendant "had sex" with her after her son was born.

The victim testified that, in August of 2015, she was getting her hair done at a friend's house on East Magnolia Avenue. She stated that her mother came to see Defendant, who also lived on East Magnolia Avenue. The victim said that she heard her mother shouting and that she walked to Defendant's home to see why they were yelling. The victim stated that her mother was shouting at Defendant, "Why you got so much hate towards [the victim]?" The victim told her mother:

> Mama, he got hate towards me because he's in love with me. He want me to be his girl because I have his child, but there's no way that's gonna happen. [He's] my baby's father and then how would that look on my plate, me being with [him] and [he's] my sister's new father?

The victim testified that her mother was very upset when she learned that Defendant was the father of J.B. because the victim "didn't tell her way before." Defendant and the victim's mother continued arguing, and the victim called the police because she "thought it was time for [her] to tell what happened instead of . . . holding it in." The victim stated, "I didn't feel safe around any man."

The victim then spoke with Investigator Patty Tipton at the Family Justice Center regarding Defendant's actions. Later, Investigator Tipton was present when Investigator Rachel Warren swabbed the victim's mouth and the victim's son's mouth.

On cross-examination, the victim stated that she did not remember when in 2005 Defendant "touched [her] sexually." The victim said that Defendant's identical twin, Troydell Brady, stayed with her family during a New Year's celebration in 2005. She stated that Defendant and Mr. Troydell Brady looked and talked "exactly alike" and that she would get them confused. The victim remembered Mr. Troydell Brady staying with her family when they lived on Spruce Street. The victim remembered Mr. Troydell Brady visiting her family for "more than two months" when they lived on Merchants Drive. The victim did not remember whether Mr. Troydell Brady stayed with her family when they lived on Jefferson Avenue.

The victim testified that she had always wanted her mother and her biological father to "get back together." She said that, if her parents were

- 3 -

together, she "wouldn't have to go through any of this" and that she regretted that her mother ever met Defendant. The victim said that she was "angry all the time" because she wanted her mother to meet "somebody better than [Defendant]."

The victim said that she did not remember if she and Defendant "had sex" when she lived on Merchants Drive but that they did "have sex" when she lived on Jefferson Avenue. She remembered that the weather was hot and that the kids were outside when Defendant "had sex" with her.

The victim testified that, when she found out she was pregnant with her son, she told her mother that her son's father was someone named "Jordan." The victim said she "made up" a name. The victim said that she never said that Mr. Troydell Brady was her son's father. The victim said that Mr. Troydell Brady was never "inappropriate" with her but that she still feared he would "do the same" as Defendant. The victim said that the only person who could have touched her and raped her was Defendant because Defendant was the only one in the house supervising her and her siblings while her mother was at work.

On redirect examination, the victim testified that Mr. Troydell Brady never stayed with her family on the occasions that Defendant touched her and had sex with her.

The victim's mother testified that she had seven children and that Defendant was the father of her two youngest children. The victim's mother said that she first met Defendant in 2003 when she was still married to the victim's father. She said that she, Defendant, and her six children moved from New Orleans to Knoxville after Hurricane Katrina and lived on Clearfield. In 2009 or 2010, the victim's grandmother also moved from Texas to Knoxville.

The victim's mother testified that, when they lived on Clearfield, there were times when she left Defendant to supervise the children. She said that the victim never mentioned that Defendant was inappropriate with her and that she had no reason to believe that Defendant would harm her. She stated that she and Defendant moved to a home on Spruce Street. Later, in 2009, the victim's mother and Defendant lived on Merchants Drive. She stated that Defendant continued supervising the children when she was at work.

The victim's mother testified that the victim began having monthly cycles when she was eight years old. In November 2009, when the victim was eleven years old, she began complaining about her stomach, so the victim's mother took her to the doctor. She testified that the doctor informed her that the victim was

pregnant, and the victim's mother "got sick" at the news. The victim told her the father of the baby was named "Javante or something like that."

When the victim's mother informed Defendant that the victim was pregnant, he did not respond. The victim's mother testified that she then took her children to the store and that, upon their return, they found Defendant unconscious on the couch. The victim's mother found pills on the bathroom floor and in the hallway, and she found a note near the couch saying, "I'm sorry for what I done to you." The victim's mother telephoned a doctor that she used to work with, and he came over to see Defendant. The doctor told her to call the police.

Later, someone from the Department of Children's Services spoke with the victim's mother about the victim's pregnancy. The victim's mother decided that the victim would have an abortion. The police were present on the day the abortion was performed to take "a sample of the baby." The police never provided any further information to the victim's mother regarding the victim's pregnancy.

The victim's mother testified that she and her children lived on Jefferson Avenue in July 2010. She said that Defendant and his brother stayed at the house sometimes in July 2010. The victim's mother agreed that Defendant would sometimes pick up the victim from school.

In March 2011, when the victim was thirteen years old, the victim told her mother that her stomach hurt and that she needed to go to the hospital. When they arrived, the victim was preparing to deliver a baby at thirty-seven weeks' gestation. The victim told her mother that the father was someone that had a name starting with "J" but said that she could not remember the exact name the victim used.

The victim's mother testified that, in August 2015, she was living "on and off" in a hotel while she went through domestic issues with her then-husband. She said that Defendant would visit the two children they shared and that Defendant lived on East Fifth Avenue with the victim's mother's niece and Defendant's brother. The victim's mother went to the house on East Fifth Avenue to ask her niece to assist the victim, and Defendant "jumped in" with "something to say." The victim's mother became upset with Defendant and said, "What is up with you and my daughter?" The victim heard the argument, which was happening outside the house, and she walked to the house. The victim then told her mother that Defendant was the father of her son. The victim's mother testified that she wanted to kill Defendant. She went inside and "grabbed a knife and went after" Defendant but stopped when her two daughters came in.

- 5 -

After the victim called the police, the victim's mother called her son. The victim's mother testified that her son arrived just before the police but that he never threatened anyone and did not have any weapons. The victim's mother spoke with police and later spoke with Investigator Tipton. She testified that, while the victim was growing up, she never had any idea that "this was going on with" Defendant.

On cross-examination, the victim's mother testified that she and Defendant were in a relationship for more than eleven years "off and on." She said that the victim never had any complaints about Defendant. The victim's mother stated that she dated someone named Bill Lewis for "a couple of years" and that, when she found Defendant unconscious, she and Mr. Lewis were dating.

The victim's mother stated that, when she and her family lived on Clearfield, Mr. Troydell Brady never came and stayed with them. She said that Mr. Troydell Brady did stay with her family "for a week or two" when they lived on Spruce Street. She said that Mr. Troydell Brady stayed with her family "for a month or two" when they lived on Merchants Drive.[2] She said that Mr. Troydell Brady came and stayed with her family on Jefferson Avenue "the month [of] July for the birthday party." The victim's mother stated that, whenever she saw the victim around Mr. Troydell Brady, the victim's mother's niece was always present as well.

Investigator Patty Tipton with the Knoxville Police Department said that she was called to an address on East Fifth Avenue on August 24, 2015, following a report that an individual had been "molested." She interviewed the victim and the victim's mother separately at the Family Justice Center. Investigator Tipton asked Defendant to give a statement at police headquarters, and she informed Defendant of his *Miranda* rights prior to the interview. Defendant waived his rights in writing, and his interview was video and audio recorded. During the interview, Defendant repeatedly admitted to having "consensual sex" with the victim when she was eleven and twelve years old:

[INV. TIPTON]: Any consensual sex going on between you two?

[DEFENDANT]: Now I won't lie, I did have consensual sex.

---

[2] There is confusion in the record regarding whether the victim's mother was talking about Mr. Troydell Brady or Defendant staying with her family when they lived on Merchants Drive. Defense counsel asked a question using the name "Troydell," and the victim's mother responded using the name "Trendell."

. . . .

[INV. TIPTON]: How many times did y'all have sex on Jefferson [Avenue]?

[DEFENDANT]: [R]ight about two times. Three or two times. . . . I felt it was wrong.

[INV. TIPTON]: Why?

[DEFENDANT]: Why I felt it was wrong? 'Cause for one, I was too old. She was young. That's why I felt it was wrong. I tried to put a stop to it.

[INV. TIPTON]: How old was she?

[DEFENDANT]: Twelve, I think.

[INV. TIPTON]: Sometimes was she eleven? Did it start when she was eleven, or was she twelve?

[DEFENDANT]: The time that it first happened, I think she was eleven.

[INV. TIPTON]: So on Merchants [Drive], she was eleven?

[DEFENDANT]: Yes, I think so.

[INV. TIPTON]: And then Jefferson Avenue, she was twelve?

[DEFENDANT]: Yes, ma'am. Yes, I think so.

. . . .

[INV. TIPTON]: So you told her that because she was eleven and twelve that she was just too young to be having sex?

[DEFENDANT]: Yeah. It kept happening I guess until 2012.

[INV. TIPTON]: Did she still wanna have sex, or did you wanna still continue to have sex, or you just weren't able to get together or what?

[DEFENDANT]: No I just, I wanted to stop it. . . . In 2010 she told her mom that she was in love with me.

[INV. TIPTON]: In 2010, she told her mom?

[DEFENDANT]: Yes. . . . We had consensual sex, you know. . . . It was consent, it never was rape. I regret whatever happened all those years. . . . I'm very glad this happened, you know, because it's so much stress was built upon me. . . . I know I didn't rape her, it was consensual.

During Investigator Tipton's interview with Defendant, Defendant claimed the victim "liked to be on top" during sex. Defendant described lying down with the victim and agreed with Investigator Tipton that he inserted his penis into her vagina. He said he only used a condom "about half" of the time.

During a jailhouse phone call with his sister, Defendant agreed with his sister that, when he had sex with the victim, she was "young":

[SISTER]: Your life just going down the drain for nothing. You didn't rape this little girl – that little girl give you that p*ssy.

[DEFENDANT]: Yeah

[SISTER]: But at the same time, she was young, you know?

[DEFENDANT]: Yeah

During another jailhouse call with his sister, Defendant stated that there was "no possible way" that Mr. Troydell Brady had sex with the victim:

[SISTER]: That baby couldn't have never been from Troydell 'cause Troydell never f*cked her. . . You should have let them b*tches swab Troydell['s] mouth. Troydell could have played like he was you. He wouldn't have [gone to] no f*cking jail 'cause they ain't got nothin' on him. . . .

- 8 -

[DEFENDANT]: Yeah . . . we identical twins, got the same DNA.

[SISTER]: . . . Y'all [can't] know who – who the daddy really is 'cause y'all got the same DNA?

[DEFENDANT]: Yeah . . . so either way it go[es], either one of us gonna go to prison 'cause he got the same DNA I have. Just like the lawyer sa[id], he sa[id], "y'all twins, there's no possible way that your brother could've had sex with her?" I said, "[N]o, there's no possible way."

Investigator Tipton testified that she recovered the victim's aborted fetus from 2009 and also Defendant's DNA from a buccal swab. She said she collected DNA from the victim and the victim's son with buccal swabs. After receiving the DNA results, Investigator Tipton presented an indictment to the grand jury for rape of a child.

On cross-examination, Investigator Tipton stated that, during Defendant's interview, Defendant stated that he had completed the eleventh grade and had been in "special ed." Defendant told Investigator Tipton that he had difficulty spelling words. Investigator Tipton agreed that, when Defendant stated, "I did not rape her," Defendant was under the impression that he was being accused of rape.

Rhett Carter testified that, in 2009, he worked for the Knoxville Police Department as an investigator in the family crimes unit. He stated that DCS sent a referral regarding an eleven-year-old girl living on Merchants Drive who had been pregnant. Through his investigation, he learned that the father of the baby was a fifteen-year-old boy named "Javante" or "Lavante." The victim and her mother gave Investigator Carter an address, but no one by the name "Javante" or "Lavante" lived there; the apartment was vacant. Investigator Carter said that, at that point, there were no further leads to investigate. When Investigator Carter learned that the victim planned to terminate the pregnancy, he obtained permission from the victim's mother to gather DNA from the aborted fetus. After the termination, Investigator Russ Whitfield obtained the fetal tissue.

On cross-examination, Investigator Carter testified that, during his 2009 investigation, he spoke with the victim and her mother. He said that Defendant's name "did come up at some point." He said, "Apparently the night after November the 25th after I visited [the victim's mother], I was told that [Defendant] had taken some blood pressure medication and tried to kill himself."

Investigator Carter stated that he went to the hospital to speak to Defendant, but Defendant was intubated at that time.

Russ Whitfield testified that he worked as an investigator in the Knoxville Police Department's forensic unit. He said that, on December 29, 2009, he was assigned to procure fetal tissue from an abortion clinic on Clinch Avenue. He said that the sample was already prepared when he arrived and that the doctor handed him a clear, plastic tub with the remains. Investigator Whitfield put the tub in a plastic evidence bag, wrote identifying information on the bag, and sealed it. Investigator Whitfield said that the mother of the fetus was the victim "as far as I know." When he returned to the police station, the evidence was held in a refrigerated unit.

Rachel Warren testified that she worked as an investigator in the forensic unit of the Knoxville Police Department. She said that, in September 2015, she took a buccal swab of Defendant, placed it in an evidence envelope, wrote identifying information on the envelope, and sealed it. Investigator Warren stated that she also took buccal swabs of the victim and the victim's son, placed them in evidence envelopes, wrote identifying information on the envelopes, and sealed them.

Fredric Jason Scott testified that he worked in the forensics unit of the Knoxville Police Department. He stated that he packed the fetal tissue sample and the buccal swabs from Defendant, the victim, and the victim's son and sent them via Federal Express to DNA Diagnostic Center in Ohio in April of 2016.

Jessica York testified as an expert in forensic DNA analysis and said that she worked at the DNA Diagnostic Center in Fairfield, Ohio. She said that she tested the DNA samples of the fetal tissue from the victim's 2009 pregnancy, as well as the buccal swabs from Defendant, the victim, and the victim's son. She tested the fingers of the fetus because fingers "are a very good source of DNA" and that she is "very successful at getting full profiles of just the child and not a mixture with mom when [she] test[s] a sample like that."

On cross-examination, Ms. York agreed that no two individuals have the exact same DNA "except identical twins." She stated that she did not perform a DNA analysis of Mr. Troydell Brady.

John Peterson testified as an expert witness in forensic DNA analysis and had a Ph.D. in biomedical sciences. He said that he worked at the DNA Diagnostic Center in Fairfield, Ohio. He stated that, based on the DNA analysis,

there was a 99.99 percent likelihood that Defendant was the father of the fetus and a 99.9999997 percent chance that Defendant was the father of the victim's son.

On cross-examination, Dr. Peterson agreed that there was "some contamination" of the fetal tissue sample. He stated that "[i]dentical twins, for this type of testing, would have the same DNA profile." Dr. Peterson said that he was unaware of any type of testing that would be accepted by courts that would be able to distinguish between identical twins.

At the close of the State's proof, the State presented the following election of offenses:

| COUNT | OFFENSE | DATE |
|-------|---------|------|
| Count one | Digital penetration of the victim at Clearfield residence | 2005 |
| Count two | Digital penetration of the victim at Spruce Street residence | 2007 |
| Count three | Vaginal penetration of the victim at Jefferson Avenue residence | 2010 |
| Count four | Vaginal penetration of the victim at Merchants Drive residence | October 2009 |

Defense counsel made a Rule 29 motion for judgment of acquittal, and the trial court denied the motion. The trial court conducted a *Momon* hearing, and Defendant elected to testify.

Defendant testified that he was originally from New Orleans, Louisiana, and that his education was very poor because he was "special ed." He stated that he had difficulty with spelling, reading, and comprehension and that he completed the eleventh grade. He said that he received disability payment from "SSI" since he was nine years old due to mental and physical limitations.

Defendant said that he came to Knoxville after Hurricane Katrina with the victim's mother and their children. He stated that, at the beginning of their relationship, the victim's mother was "abusive" and "used to black[en his] eyes and stuff." He said the victim's mother was verbally abusive as well.

Defendant testified that he "never touched" the victim. He said that, the first time he met the victim, she "hauled off and slapped" him and that the victim "never approved" of his relationship with the victim's mother. Defendant stated

that he took care of the victim's mother's children "like they [were his] own." He testified that his twin brother, Mr. Troydell Brady, would often visit them. He said that, in 2007, Mr. Troydell Brady lived with them on Clearfield for "a couple of months." Defendant stated that the victim had a "crush" on Mr. Troydell Brady but that he never saw anything inappropriate between them. Defendant stated that, later, he began to suspect that something was going on between the victim and Mr. Troydell Brady because "they used to play around a lot" and he "always would just see them together."

Defendant testified that, when he and the victim's mother moved to "Christenberry," Mr. Troydell Brady again lived with them for "about five or six months." He said that he confessed to having sex with the victim while they lived on "Christenberry" because he "didn't want to get [Mr. Troydell Brady] in trouble." He said that he "was coerced to say those things 'cause [the victim's mother's] son . . . came over there with a[n] AK47 and tried to shoot [him]." Defendant stated that the victim's mother "kn[e]w the truth" about the victim and Mr. Troydell Brady, so she was "gonna get in trouble if the truth came out." Defendant said he was concerned that his children would be taken away and that his brother would go to jail.

Defendant said that, when the victim accused him of rape during the 2015 argument, he was furious. He said that the victim made the accusation because Defendant and the victim's mother were "gonna get back together." Defendant said that he was arrested that day on a warrant from Blount County for driving on a suspended license. Defendant stated that he lied to investigators when he was arrested and also later when he was interviewed by Investigator Tipton. He said that he "was told" to say that he and the victim had "consensual sex" but that he did not know what "consensual" meant. Defendant stated that he attempted suicide in 2009 because the victim's mother was "cheating on [him.]"

On cross-examination, Defendant agreed that the victim was five years old when he first met her and she "hauled off and slapped" him. Defendant recalled telling investigators in 2010 that the victim was in love with him and stating that the victim was "a good girl." Defendant agreed that there were times when he was out of work that he would supervise the children. Defendant agreed that Mr. Troydell Brady was never alone with the victim when he lived with Defendant and the victim's mother. Defendant recalled telling Investigator Tipton that the victim "kissed him" and that he had sex with her when he was high on ecstasy.

Defendant testified that he never knew that the victim was pregnant in 2009. He said that, when he tried to commit suicide, he left a note that stated:

"I'm sorry for everything." Defendant stated that, in July 2010, both he and Mr. Troydell Brady were present for the children's birthday parties. He recalled telling Investigator Tipton that, around the time of the birthday parties, he again had sex with the victim. He stated that he told Investigator Tipton that he did not want to have sex any longer and told the victim, "This is wrong."

Defendant agreed that, from the day before trial to the time of his testimony, Defendant called the victim and her mother fifty-nine times and asked Mr. Troydell Brady to contact the victim and her mother as well. He agreed that he wanted to contact them to "see if they [were] going to end up showing up and testifying against [him.]"

Defendant said that, when he was speaking to his sister on the recorded jailhouse phone calls, he replied "yeah" to her statements regarding sex with the victim because every time he talked to his sister, he "always sa[id] 'yeah.'" He recalled telling his sister that the prosecution was "up to [the victim]" and that his sister could find the victim on Facebook. Defendant said that, when he told his sister in the jailhouse phone call that there was "no possible way" Mr. Troydell Brady had sex with the victim, he was trying to protect his brother.

On redirect examination, Defendant testified that he did not know if Mr. Troydell Brady was ever alone with the victim because there were times when Defendant was at work and was not present when the victim was in the house with Mr. Troydell Brady.

After deliberations, the jury found Defendant not guilty in counts one and two and guilty of rape of a child in counts three and four.

*Sentencing Hearing*

The trial court subsequently held a sentencing hearing, and the victim presented a victim impact statement. She said that being raped impacted her life and that, as a result, she treats her son in a way that she should not treat him. The victim stated that she wanted counseling so that she "wouldn't have to think about . . . all that went on and sit in the dark every night" and contemplate suicide. The victim told Defendant that she was not angry and did not hold a grudge for the sake of her sisters and her son.

In an allocution statement, Defendant told the trial court, "I'd like to say I'm sorry for what happened to the victim. Take full responsibilities of my action. And I'm very sorry that it happened."

The trial court considered enhancing and mitigating factors.  The trial court applied enhancement factor (14), "that the defendant abused a position of private trust in a manner that significantly facilitated the commission of the offense," with a great deal of weight because Defendant was the only father figure in the victim's life.  The trial court stated,

> I think that you would not have done this to [the victim] or been able to do it had she not been so trusting of you and had her mother not been so trusting of you because she brought you into the home to be a father figure, and you knew that you could go in her room at night and close the door and she wouldn't say anything to anybody because – not 'cause she was afraid of you but because you were her father, and so – and it worked.

> She got pregnant and said it wasn't you and said it was somebody else [that did] it, and the only reason she did that is 'cause she viewed you as her father and she didn't want you to get in trouble, and so she was protecting you because you were her father, and you continued to use that position to continue to engage in the sexual abuse of her.  And so you did use it to facilitate these actions, and I think the facts strongly support that in this case and I think that's entitled to a good deal of weight.

The trial court declined to apply mitigating factor (8), that Defendant "was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense," because it did not believe that Defendant's drug use or mental problems were related to the offenses.  The trial court stated, "You're a pretty intelligent guy and you – you knew better than to do this, and so I don't think that any of that is considered as mitigation in this case even though I certainly think they're all true."  The trial court noted that Defendant was "blatantly lying while on the stand" when he testified during trial. It considered Defendant a "deceiver" and "untrustworthy" and said that "the residual consequences of [Defendant's] actions" would "last well past [eighty] years" and that the consequences would "affect generations" of Defendant's family.

The trial court then considered that Defendant was convicted of two statutory offenses involving sexual abuse of a minor.  The trial court found that, in terms of the relationship between Defendant and the victim, Defendant's position as a "father figure" was an aggravating factor.  The trial court noted that

Defendant's sexual activity with the victim lasted over two years and said that that was "not insignificant." Finally, the trial court noted that the "most aggravating" circumstance was "the extent the residual physical or mental damage to the victim[.]" It said that the victim's son was "technically not the victim" but that he would "be dealing with this issue too. I don't know how the family is gonna deal with that, what they're gonna explain to that child, but that is something [that] is gonna carry on for generations."

The trial court sentenced Defendant as a Range I standard offender to forty years to serve in counts three and four for rape of a child and ordered the sentences to be served consecutively, for an effective sentence of eighty years at one hundred percent. It stated:

> [T]his case absolutely warrants consecutive sentencing in this matter, and you know, once you get past [fifty] years on a case and start thinking, gosh, if nobody died, it's hard to sentence somebody beyond [fifty] years 'cause you're giving them a life sentence, something that somebody killed somebody wouldn't get that much, but I think if there ever was a case that deserves it's this one.

Defendant then filed a motion for a new trial, and after a hearing, the trial court noted that it was previously incorrect in the potential range faced by Defendant as a Range I standard offender under the rape of a child statute at the time of the offense. The trial court entered amended judgments for both counts with consecutive sentences of twenty-five years at one hundred percent release eligibility. The trial court denied the motion for a new trial in all other respects. This timely appeal follows.

## Analysis

### I. Sufficiency of the Evidence

Defendant argues that there was insufficient evidence for a jury to convict him of two counts rape of a child. He contends that the victim had "contradictory" statements that "cancel[led] each other." Moreover, he argues that his police interview was unreliable because he "did not understand '100%' [of] the meaning of some words" used by Investigator Tipton. Further, he argues that his jailhouse phone calls with his sister did not indicate agreement with her statements regarding the babies' paternity but rather that he said "yeah" to indicate "that he was still on the telephone and part of the overall conversation." Finally, Defendant argues that the State failed to establish a chain of custody for the fetal

remains because Investigator Whitfield did not establish that the fetal remains belonged to the victim; thus, any DNA analysis procured was "defective."

The State responds that there was overwhelming evidence of Defendant's guilt. The State further contends that Defendant has not established plain error regarding the chain of custody of the fetal tissue.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As charged in this case, "[r]ape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (2009), (2010). "Sexual penetration means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Tenn. Code Ann. § 39-13-501(7) (2009), (2010).

Here, there was sufficient evidence for a rational juror to convict Defendant of rape of a child. The victim identified Defendant as her rapist, and Defendant repeatedly confessed to "consensual sex" with the victim when she was less than thirteen years old. The victim described Defendant putting his penis into her vagina, resulting in two pregnancies. Moreover, the buccal swabs and fetal tissue

- 16 -

analysis proved that the father of the victim's children was either Defendant or Mr. Troydell Brady, and Defendant told his sister in a jailhouse call that Mr. Troydell Brady could not possibly be the father. The jury was free to reject Defendant's testimony that he was lying to detectives and his family in order to protect his brother. Further, the victim testified that Mr. Troydell Brady was not staying with her family on the occasions that Defendant touched her and had sex with her, and the jury accredited her testimony. This court will not reweigh the evidence. *Bland*, 958 S.W.2d at 659. Defendant is not entitled to relief on this issue.

### B. Chain of Custody

Defendant did not object to the chain of custody of the fetal tissue at trial or in his motion for a new trial, and Defendant has not requested plain error relief. This issue is waived. Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.")

### *II. Sentencing*

Defendant argues that the trial court abused its discretion by sentencing him to the maximum sentence within the applicable range because Defendant was convicted only of two sex acts two years apart, and the effective sentence he received was "an effective life sentence," similar to a conviction for a homicide. He further argues that the trial court's sentencing rationale, *i.e.*, that Defendant's actions would have residual consequences for generations, could be true of any number of crimes and thus was not an appropriate consideration for sentencing.

The State responds that the trial court was required to sentence Defendant to twenty-five years on each count and that the trial court did not abuse its discretion in running the sentences consecutively.

### A. Sentence Length

"Generally, a criminal offender must be sentenced pursuant to the statute in effect at the time of the offense." *State v. Smith*, 893 S.W.2d 908, 919 (Tenn. 1994). The statute under which Defendant was sentenced required a minimum twenty-five-year sentence for each offense of rape of a child. Tenn. Code Ann. § 39-13-522(b)(2)(A) (2009), (2010) ("Notwithstanding title 40, chapter 35, a person convicted of a first or subsequent violation of this section shall be punished by a minimum period of imprisonment of twenty-five (25) years. The sentence

imposed upon any such person may, if appropriate, exceed twenty-five (25) years, but in no case shall it be less than the minimum period of twenty-five (25) years.")

In construing the 2010 version of the rape of a child statute, this court has explained:

> Rape of a child is a Class A felony, the range of punishment for which is fifteen to sixty years. T[enn]. C[ode] A[nn]. § 40-35-112(a)(1) (2010). The statute provides that if the person convicted of this offense is sentenced in a higher range, i.e. as a multiple or persistent offender, then the sentence for each conviction may be set higher than the required twenty-five-year minimum sentence, if appropriate. By inference, if the defendant is sentenced as a Range I offender, as the maximum sentence for that range is twenty-five years, the sentence to be imposed must be twenty-five years for each offense of rape of a child.

*State v. William "Bill" Douglas Farr, Sr.*, No. M2016-01216-CCA-R3-CD, 2017 WL 4280701, at *7 (Tenn. Crim. App. Sept. 26, 2017) (quoting *State v. Rhonda Louise Medley*, No. M2009-02446-CCA-R3-CD, 2011 WL 2739512, at *7 (Tenn. Crim. App. July 12, 2011), *perm. app. denied* (Tenn. Nov. 16, 2011)), *perm. app. denied* (Tenn. Jan. 17, 2018).

Thus, because Defendant was sentenced as a Range I standard offender with a sentence maximum of twenty-five years for a Class A felony, and because the 2009 and 2010 versions of the rape of a child statute required a minimum sentence of twenty-five years, the trial court properly sentenced Defendant as required by statute to twenty-five years on both counts.

## B. Consecutive Sentencing

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

- 18 -

The Tennessee Supreme Court has held that the *Bise* standard applies to consecutive sentencing determinations "if [the trial court] has provided reasons on the record establishing at least one of the seven grounds" for discretionary consecutive sentencing. *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013). A trial court "may order sentences to run consecutively" if it finds that the defendant "is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts[,] and the extent of the residual, physical and mental damage to the victim or victims." Tenn. Code Ann. § 40-35-115(b)(5) (2019).

The trial court found that Defendant had been "convicted of two (2) or more statutory offenses involving sexual abuse of a minor," pursuant to Tennessee Code Annotated section 40-35-115(b)(5), which provided the trial court the discretion to order the sentences to be run consecutively. The trial court enumerated the aggravating circumstances arising from the relationship between Defendant and the victim because Defendant was the victim's father figure. The trial court also pointed out the mental anguish the victim suffers when she contemplates suicide and when she sees her son by Defendant, noting that the residual effect of Defendant's actions will "last well past [eighty] years." The trial court properly articulated its reasons for ordering consecutive sentences and did not abuse its discretion in imposing twenty-five-year consecutive sentences. Defendant is not entitled to relief.

## Conclusion

After a thorough review of the facts and applicable case law, we conclude that the evidence was sufficient for a rational juror to have found Defendant guilty of two counts of rape of a child beyond a reasonable doubt and that the trial court did not abuse its discretion by sentencing Defendant to a total effective sentence of fifty years at one hundred percent service. Therefore, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 19 -